IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GEORGE ULIBARRI

    Plaintiff

Vs.                                                                                        Civ. No._____

MIKE MARTINEZ, in his individual capacity, and
THE SANTA FE COUNTY BOARD OF
COUNTY COMMISSIONERS/ D.B.A. SANTA         Demand For Jury Trial
FE COUNTY SHERIFF'S DEPARTMENT

    Defendants

COMPLAINT

**I.    Introduction**

    This case arises from the unlawful arrest and malicious prosecution of Plaintiff George Ulibarri, then a 77 year old, retired New Mexico State Police captain by Defendant Martinez, a sergeant employed by the Santa Fe County Sheriff's Department. Plaintiff reported a domestic abuse/domestic violence incident to 911 on October 10, 2012, wherein his daughter was being assaulted, battered and harassed by her estranged husband while a divorce proceeding was pending. Plaintiff drove to his daughter's home and her husband responded with anger and belligerence. Plaintiff's daughter, Patricia Gallegos, called 911 requesting a police officer because her husband was "out of control" and "fighting with her father." Not long after this call, Mr. Gallegos left the scene and Defendant Martinez arrived. Mrs. Gallegos and Plaintiff reported the details of the domestic violence incident to Defendant Martinez, including the fact that her husband had assaulted and battered her. However, Defendant Martinez failed to take any of the

1

steps or provide Mrs. Gallegos with any of the information reasonably necessary to protect her from possible future abuse that are required to be taken and given by law enforcement officers by the New Mexico Family Violence Protection Act, §40-13-1 et. seq., when a spouse reports being harassed and/or assaulted by a spouse.  Moreover, despite the written policy of Defendant Santa Fe County Sheriff's Department which mandates that an incident report must be written whenever a deputy investigates domestic abuse/domestic violence call, Defendant failed to make a report regarding what he was told. Because Mr. Gallegos' vehicle was observed by Mrs. Gallegos driving by her residence while they were reporting the incident, Plaintiff told Defendant Martinez that he feared for his daughter's safety, intended to drive by Mr. Gallegos' residence and if Mr. Gallegos' truck was not there, Plaintiff would return to his daughter's home and spend the night there.

After leaving the scene where the acts of domestic violence occurred, Mr. Gallegos, in an effort to divert attention from his conduct, called 911 and fabricated a story that Plaintiff had "pulled a gun out on" him.  Defendant Martinez went to interview Mr. Gallegos who falsely claimed Plaintiff had cocked a pistol, placed it in his waist and stood in front of him with his hand on the gun and threatened to shoot him.  During that time period, Defendant Martinez saw Plaintiff's truck drive past Mr. Gallegos' residence. Defendant then drove after Plaintiff, ordered him out of his vehicle, handcuffed him and placed him inside the police unit under arrest.  Plaintiff was given a Miranda warning but agreed to talk. Plaintiff denied Mr. Gallegos' allegation.

Defendant Martinez knew Mr. Gallegos was involved in a contentious divorce proceeding.  Defendant knew he was a suspect in the recently reported domestic violence

incident, had a motive to fabricate a story about the incident and thus was not an unbiased, reasonably trustworthy "victim" reporting a crime.  Defendant knew he had no information corroborating Mr. Gallegos' story.  Defendant knew that Plaintiff was a retired police officer with a long history in law enforcement.  Defendant Martinez further knew that Mrs. Gallegos was an eyewitness to what had occurred at the scene and that she was readily available to be interviewed at the scene or by phone.  Despite having the time to do so, Defendant Martinez decided not to interview Mrs. Gallegos that evening before having Plaintiff taken to jail and filing Aggravated Assault charges against him.  Nor did Defendant, who knew Mrs. Gallegos was alone now that Plaintiff had been arrested, call Mrs. Gallegos to check and make sure Mr. Gallegos had not returned to engage in further acts of domestic violence.   In fact, Defendant never interviewed Mrs. Gallegos about the incident.  The Office of the District Attorney ultimately dismissed the charge.

   The arrest without probable cause and the subsequent criminal prosecution instigated by Defendant Martinez was reported on television, in the print media and continues to be posted on the Internet and resulted in serious emotional and psychological trauma, which had and continues to have serious physical manifestations. Plaintiff further contends that the injuries he suffered were a direct and proximate result of the failure of defendant Santa Fe County Board of County Commissioners to properly train, supervise and/or discipline deputy sheriffs, including defendant Martinez, on the law regarding probable cause for arrest, a failure which resulted from the Board of County Commissioners of Santa Fe maintaining an unwritten custom, policy, or practice which permitted or condoned the type of unlawful conduct alleged herein by Plaintiff.

**II.     Jurisdiction and Parties**

2.  Plaintiff brings this action pursuant to 42 U.S.C. §1983.  This court has jurisdiction over the federal claims under 28 U.S.C. §§1331 and 1343. Supplemental jurisdiction is present over the state law claims pursuant to 28 U.S.C. §1367.

3. Plaintiff George Ulibarri is a 78-year-old resident of Santa Fe County, New Mexico. Plaintiff is a retired New Mexico State Police captain who had a long and illustrious career in law enforcement with the State Police and other state and federal law enforcement agencies.  Prior to October 10, 2012, Plaintiff had never been arrested.

4. Defendant Martinez was, upon information and belief, a resident of Santa Fe County, New Mexico. At all times material hereto, defendant was employed by the Santa Fe County Sheriffs' Department. Defendant acted under color of law at all times relevant to this action and in the course and scope of his employment and is sued in his individual capacity.

5. Defendant Board of County Commissioners of Santa Fe County ("Santa Fe County") is the governmental entity responsible for the hiring, retention, training, supervision and discipline of its Deputy Sheriffs, including Defendant Martinez, and is the entity liable in suits for damages caused by Santa Fe County employees.

**II.     The Background To The Events Of October 10, 2012.**

6. During October 2012, Plaintiff's daughter, Patricia Gallegos, was involved in a divorce proceeding with her husband. The divorce action, filed in February 2012, had become  very acrimonious.   Mrs. Gallegos informed Plaintiff that Mr. Gallegos' communications with her were often hostile, that he was often yelled at her, that after August 31, 2012, that he was extremely upset and resentful of the fact that she was going to have possession of their house in La Cieneguilla, New Mexico, and that he had

4

become angry and volatile after seeing Plaintiff and Mrs. Ulibarri, who he had gotten along with prior to the divorce proceeding, driving near the house. Plaintiff was further informed by his daughter that in late August 2012, Mr. Gallegos had taken three guns from the residence and that because of her husband's ongoing conduct Mrs. Gallegos feared for her safety. Plaintiff further understood that Mr. Gallegos kept one or more of those guns in his vehicle.

7. By late September 2012, the domestic dispute had reached the point that Mrs. Gallegos' attorney informed Mr. Gallegos' attorney on at least two occasions that a law enforcement officer needed to be present any time Mr. Gallegos was to go to the house to pick up his personal property. Plaintiff was aware of this fact.

**III. The Facts Regarding The Acts of Domestic Abuse And the 911 Calls By Plaintiff And His Daughter That Caused Defendant's To Be Dispatched To 88 Camino Montoya in La Cieneguilla, New Mexico.**

8. On the evening of October 10, 2012, Mr. Gallegos went to the house without a police officer. He arrived after dark. Mrs. Gallegos had most of his personal items packed up in the garage. Mr. Gallegos was hostile, belligerent and extremely aggressive with Mrs. Gallegos. He pushed and shoved her twice, yelled and repeatedly cursed at her and placed her in fear for her safety.

9. Around 7:30 pm, Plaintiff called his daughter. Patricia told him that Mr. Gallegos was at the house, had come to pick up his belongings and was arguing with her and refusing to leave. Plaintiff was further told that Mr. Gallegos had shoved her in an attempt to force his way into the house. Based on what he knew had been transpiring over the past couple of months, Plaintiff was concerned for his daughter's safety. He told Patricia that he was going to call 911 and report the matter and would drive over to her

house.  After getting off the phone, Plaintiff called 911 about what was going on, asked that they send a State Police officer, and then drove from Santa Fe to La Cieneguilla.

10.  After learning what had transpired between Mrs. Gallegos and Plaintiff, Mr. Gallegos told her he would leave, that there was no need for the police to come or for Plaintiff to come.  During this time, the New Mexico State Police dispatcher called Mrs. Gallegos to see if she was all right and she told him that her husband was going to leave and she would not need a police officer.  However, Mr. Gallegos did not drive off.  Instead, Mr. Gallegos continued to argue with Mrs. Gallegos and curse at her and yelled that her father did not need to come.

11.  Plaintiff arrived at the house around 7:55- 8:00pm.  Mrs. Gallegos was standing inside the garage and Mr. Gallegos was standing by the door to his vehicle, which was open.  He had various items in the back seat and on the front seat.  Mr. Gallegos was angry and upset and moved quickly, actually charging towards Plaintiff's truck.  Mrs. Gallegos attempted to move to cut him off.  Mr. Gallegos got so close that Plaintiff was unable to open the door to get out.  Plaintiff normally keeps a gun in his truck, a fact known by Mr. Gallegos from 31 years as Plaintiff's son-in-law.  When he arrived at Patricia's home Plaintiff had his gun holstered.  It was placed on the console of the front seat of the truck.  Due to the information he had received from his daughter about Mr. Gallegos' behavior and because of the aggressive manner in which Mr. Gallegos had approached him, Plaintiff, whose experience as a police officer caused him to be cautious, pushed the gun over to the passenger seat in order to prevent Mr. Gallegos from being able to reach inside and grab it.  Mr. Gallegos saw the gun.  Mr. Gallegos told Plaintiff he did not need to be there, that this was not his problem and that Mr. Gallegos

6

had previously had a good relationship with his in-laws. Mr. Gallegos appeared upset. In fact, he was obviously distraught. He angrily told Plaintiff he had nothing left to live for, that he had lost everything and that Plaintiff should just go ahead and shoot him.

12. Plaintiff understood that Mr. Gallegos had "lost it," was unstable at the moment, and that the situation was therefore a dangerous one. Plaintiff calmly told Mr. Gallegos he would not do any such thing and stated that Mr. Gallegos should not be there that late and without a police officer to stand-by and told Mr. Gallegos they did not want any problems and he should just get his things and leave. Mr. Gallegos was made even angrier by this statement. He yelled at Plaintiff that this was "none of your business", that Plaintiff should not be there and repeated things he had previously said to Plaintiff. Plaintiff again told Mr. Gallegos they did not want any problems and asked him to take his property and leave. Mr. Gallegos was about 25 years younger than Plaintiff and was substantially larger in size.

13. Mr. Gallegos, who was standing close by Plaintiff's truck, pointed his finger at Plaintiff, gestured with his hands, and yelled at Plaintiff, who was still inside the vehicle, that he was not leaving, that this was his house and that no one- not Plaintiff, not a judge and not a police officer- could keep him away from the house because his name was on the lease. Mr. Gallegos demanded that Patricia get a leather coat that was not among the items she had put together for him to take. Fearing for the safety of her father and herself, Mrs. Gallegos quickly dialed 911 on the phone she had on her person, ran inside with the phone, quickly grabbed the coat and, within a brief time was back outside where she put the coat in Mr. Gallegos' truck bed. Mr. Gallegos was still standing close by Plaintiff's truck, yelling at Plaintiff who was sitting inside.

7

14. Mrs. Gallegos told the 911 dispatcher that her husband was refusing to leave, that he was "out of control" and needed to leave but would not. She stated that Mr. Gallegos was "fighting" with Plaintiff and asked the dispatcher to have a police officer "hurry" over there. Her tone of voice reflected the urgency of the situation. Defendant Martinez was dispatched to the residence.

15. Mrs. Gallegos went over and attempted to get in between Mr. Gallegos and Plaintiff. Mr. Gallegos was pushing her to get closer to Plaintiff while Mrs. Gallegos attempted to push Mr. Gallegos away from her father. She repeatedly told Mr. Gallegos to go, to get his stuff and go but he refused to leave. Mr. Gallegos again yelled something to the effect that it was his house and no one could make him leave.

16. Mr. Gallegos then went over to the open door of his own vehicle. Plaintiff got out of his truck to go inside the garage where Mrs. Gallegos had walked, taking the holstered gun from the passenger seat in his hand. Mrs. Gallegos was inside at the rear of the garage by the control button for the garage door. She intended to shut it as soon as her father could get inside and told Plaintiff to get inside the garage. Plaintiff walked toward the garage. Plaintiff kept an eye on Mr. Gallegos and was half way inside when Mr. Gallegos, standing by the open door of his truck, said something to the effect of "Don't forget George, I have guns, too." Plaintiff knew Mr. Gallegos had taken his weapons from the house and believed to have them in his truck. Plaintiff saw Mr. Gallegos searching through his truck with his left hand as he said this. Plaintiff had seen Mr. Gallegos acting in an extremely belligerent manner that had threatened his daughter's safety and his own safety. Mr. Gallegos was both angry and distraught. Plaintiff reasonably believed Mr. Gallegos was looking in his truck for a gun with the intention of

8

doing immediate harm to either himself and/or his daughter and warned Mr. Gallegos not to pull a gun on him.  Realizing from hearing Mrs. Gallegos' call to 911 that the police were on their way to the house, Mr. Gallegos drove off.  At no time did Plaintiff ever cock his gun.  At no time did Plaintiff remove his gun from its holster, and at no time did Plaintiff have his gun in his waist or pointed at Mr. Gallegos or in his direction.

**IV.  The Facts Regarding Defendant Martinez's Knowledge Of The Acts Of Domestic Abuse That Occurred At The House Before He Arrived, What Occurred While He Was There, And His Failure To Respond To The Allegations of Domestic Abuse.**

17.  Defendant Martinez arrived at Mrs. Gallegos' residence around five minutes after Mr. Gallegos had driven off.  Mrs. Gallegos and Plaintiff spent around 15 minutes explaining to Defendant Martinez what had occurred.   Inter alia, Mrs. Gallegos told Defendant Martinez that she and her husband were involved in a divorce proceeding, that her husband had come to the house after dark to pick up personal effects that she had waiting for him.  She told Defendant that Mr. Gallegos had been angry and violent.  She told Defendant that from the moment he had arrived, Mr. Gallegos had yelled at her and had cursed at her repeatedly.  She told Defendant Martinez that Mr. Gallegos and had physically shoved her in a rough manner. She told Defendant Martinez one place she had been standing when her husband had pushed and shoved her.  She told Defendant that Mr. Gallegos had yelled at Plaintiff.   She and Plaintiff told Defendant that Mr. Gallegos had told Plaintiff to shoot him because he "had lost everything" and had nothing to live for.  Mrs. Gallegos told Defendant Martinez that Mr. Gallegos had angrily yelled to her and Plaintiff that no one, not her father, a police officer or even a judge, could make him leave the house because his name was on the lease.  Around 8-10 minutes later a State Police officer arrived at the scene of the domestic violence incident.   She stated that Mr.

9

Gallegos had taken his guns from the house and was likely to have in his truck and that was the reason she thought he had left his truck door open. Plaintiff stated that he had arrived with his gun and carried it into the house. Defendant asked him where it was now and Plaintiff told him it was on the kitchen table.

18. At one point while they were talking inside the open garage, Mrs. Gallegos noticed a truck that appeared to be Mr. Gallegos' truck drive by the house. She stated that Mr. Gallegos' truck had just driven by and all four persons turned to look. Mrs. Gallegos and Plaintiff continued to talk with the officers for several minutes. Plaintiff was extremely worried for his daughter's safety after learning that Mr. Gallegos apparently had not gone home but was still in the area. Before Defendant Martinez left Mrs. Gallegos' house, Plaintiff told him that he was going to stay there with his daughter for awhile because she was upset. Plaintiff further told Defendant Martinez that he was concerned that Mr. Gallegos had driven by. Plaintiff told Defendant Martinez that he was going to drive by the residence Mr. Gallegos was staying at to make sure he had gone home and that if he did not see the truck there, he was going to come back and stay the night with his daughter.

19. Defendant Martinez knew that he had been dispatched to Mrs. Gallegos' home to investigate an alleged domestic abuse/domestic violence incident. The information provided to him by Mrs. Gallegos and by Plaintiff evidenced that acts constituting domestic abuse or violence under §40-13-2(D)(2)(b) (c)(d) and (i), NMSA, had occurred, including acts of criminal assault and battery against Mrs. Gallegos by her husband. Despite the fact that §40-13-7(B)(1) NMSA required Defendant to advise Mrs. Gallegos of the remedies available to her under the Family Protection Act, of her right to

file a written statement regarding what had occurred, and of her right to file a criminal complaint, Defendant Martinez did none of this.  Nor did Defendant advise Mrs. Gallegos of the procedure for initiating proceedings under the Act or for initiating criminal proceedings or provide her with the name and number of the District Attorney's Office or inform her of the importance of preserving evidence.

20.  Defendant Martinez did not ask either Mrs. Gallegos, the victim of the domestic abuse, or Plaintiff who had witnessed some of the verbal harassment of Mrs. Gallegos to provide a written statement.  In fact, despite the fact that it is the general practice of all law enforcement agencies that a report must be made when an officer is informed of an allegation of domestic abuse, Defendant Martinez failed to prepare a police report or otherwise document the fact that an act of alleged domestic abuse/domestic violence had been reported to him.  Defendant Martinez failed to conduct any investigation into Mrs. Gallegos' allegations of domestic abuse in order to determine whether he needed to exercise his right under §40-13-6(C) to make a warrantless arrest of the husband for the assault, battery and /or harassment reported to him or to at least report the incident to the District Attorney's Office.

21.  Defendant Santa Fe County Sheriff's Department written policy. S.O.P No. 8-15, required that deputies responding to a domestic violence call must interview all parties, including all witnesses, about the alleged incident and when an assault or battery "prepare an offense/incident report" about the incident.   Defendant Martinez failed to prepare any report about the reported acts of domestic abuse and failed to interview Mr. Gallegos about the alleged assault, battery and harassment reported by Mrs. Gallegos.

11

22.  Defendant Martinez was totally indifferent to the alleged unlawful conduct that Mrs. Gallegos had been subjected to, had no interest in determining whether the male spouse had engaged in improper conduct and was indifferent to what had allegedly been done to the wife.

**V.  The Facts Regarding The Arrest of Plaintiff And The Instigation Of Criminal Felony Charges Against Plaintiff By Defendant Martinez.**

23.  After leaving the scene of the domestic abuse, Mr. Gallegos became concerned about the potential for criminal charges being filed against him and about the potential impact his conduct might have on the divorce proceedings and decided to try and obviate any such impacts by making a claim that he had simply gone to pick up his personal belongings and Plaintiff had arrived with a gun in his hand and then stepped outside the truck with his gun still in hand and threatened to shoot him.  Mr. Gallegos did not initially call the police.  Instead, around 8:40 pm, almost 3/4 of an hour after he left 88 Camino Montoya, Mr. Gallegos, who had a cell phone with him, called his divorce lawyer.

24.  After a discussion, the divorce lawyer advised Mr. Gallegos to call the police. In an effort to divert law enforcement attention from his criminal conduct, he called 911. Mr. Gallegos stated that he was involved in a divorce proceeding, had gone to the house where his wife lived to pick up some clothes when Plaintiff showed up.  He then falsely stated that Plaintiff pointed or pulled a gun out on him.

25.  Defendant Martinez was dispatched to the residence in Santa Fe where Mr. Gallegos was staying.  Mr. Gallegos spoke with Defendant.   Defendant did not take a statement or interview Mr. Gallegos regarding the allegations of domestic abuse that Defendant had been dispatched to 88 Camino Montoya to investigate.   Mr. Gallegos

12

claimed that when Plaintiff arrived at the residence Mrs. Gallegos went inside the house. He claimed he went over to Plaintiff's truck "to greet him." He claimed that as he approached the truck, Plaintiff was holding his gun in his hand, cocked the gun and told Mr. Gallegos he had no business being there that late. He claimed that he told Plaintiff he was unarmed and if he wanted to shoot him, to go ahead and do so. He said that his wife came back out, pushed him towards his truck, and that at that time Plaintiff got out of his truck with his gun in his waistband, stood in front of Mr. Gallegos with his hand on the gun, and stated "Give me a reason to put a bullet in between your eyes." None of these statements were true.

26. Defendant Martinez knew Mr. Gallegos was an interested party in a contentious divorce proceeding that had culminated in the assault and battery and harassment of Mrs. Gallegos reported to Defendant that evening. Defendant Martinez knew that Mr. Gallegos was a domestic violence suspect stemming from an incident that had happened only an hour earlier and could be facing criminal charges for that conduct. Defendant Martinez also knew it was not unusual for a domestic abuse suspect to try and divert law enforcement attention from the abuser's conduct by blaming his partner or a friend or relative of the his partner for any wrongdoing that occurred. For example, Defendant knew or should have known that it was common when one spouse in a divorce proceeding files a Motion for a Protective Order, that the accused spouse will file for a similar order blaming the other spouse. Thus, Defendant Martinez knew or should have known that Mr. Gallegos was not a reasonably trustworthy crime victim who reports a crime with no motive to fabricate or exaggerate but was an interested party who had such a motive.

27. During the time Defendant Martinez was speaking with Mr. Gallegos, Plaintiff drove by the residence to see if Mr. Gallegos' truck was there, as he had told Defendant he was going to do before Defendant left 88 Camino Montoya.  Having seen Mr. Gallegos' vehicle, Plaintiff was headed back to his home.  Mr. Gallegos saw Plaintiff's truck and told Defendant that Plaintiff was driving by the house.  Defendant Martinez got into his unit, followed Plaintiff for a short while, and then put his emergency lights on.  As soon as Plaintiff saw the lights, he realized an officer was behind him and immediately pulled over.

28. The first question Defendant asked Plaintiff was why he was driving past Mr. Gallegos' house.  Plaintiff said he had driven there to make sure that Mr. Gallegos had left the area around his daughter's house.  Plaintiff specifically reminded Defendant Martinez that he had told him that he was going to do that at the time Defendant was leaving his daughter's house.

29. Defendant then ordered Plaintiff to get out of his truck.  Defendant then handcuffed Plaintiff and put him into the back seat of the police car and closed the door.  Plaintiff was effectively under arrest.

30. Defendant then went back to Plaintiff's truck and took Plaintiff's gun which Plaintiff had told him was in the truck on floor under the seat.  The gun was in the holster.  Defendant returned to the police unit and told Plaintiff that another officer was en route to assist him and would be there soon.  Defendant Martinez provided Plaintiff with his *Miranda* rights.  Plaintiff proceeded to talk.  A brief interview occurred  wherein denied Mr. Gallegos' allegations.  Another deputy sheriff then arrived and Defendant Martinez had Plaintiff transferred to that unit and transported to the Santa Fe County Jail.

At the jail, Plaintiff was photographed, fingerprinted and was given a red jump suit to wear.  Plaintiff was given a metal bed with a two-inch mattress and only a single blanket. The temperature in the room was very cold and Plaintiff was unable to sleep.

31.  Defendant Martinez knew that the alleged victim, Mr. Gallegos, was the suspect in a domestic violence incident committed about an hour before he called 911 claiming he was the victim of an aggravated assault by his father-in-law.  Defendant knew Mr. Gallegos was involved in a contentious divorce proceeding with Plaintiff's daughter.  Defendant knew the reason why Plaintiff was driving in the area of Mr. Gallegos' house because Plaintiff had told Defendant he was going to do so and why he was going to do so while Defendant was still at Mrs. Gallegos' house and therefore the fact that Defendant saw Plaintiff drive by Mr. Gallegos' house was without significance. Defendant knew that Mrs. Gallegos was an eyewitness to what had transpired between Mr. Gallegos and Plaintiff and knew that she was readily available to be interviewed at the scene where the crime alleged by Mr. Gallegos had supposedly occurred.  Defendant knew or should have known that Mrs. Gallegos' statements were potentially exculpatory information.  However, Defendant Martinez chose not to interview Mrs. Gallegos before arresting Plaintiff.  Defendant knew that Plaintiff had a long history as a law enforcement officer.  However, other than listening to Mr. Gallegos, Defendant spent less than ten minutes on the case before Plaintiff was transported to jail.

32.  Defendant Martinez knew or should have known that Mr. Gallegos was an interested party, a biased witness with a motive to fabricate a story in order to divert attention from his criminal conduct because Defendant had been sent to Mrs. Gallegos' home to investigate domestic abuse allegations against Mr. Gallegos that evening and had

15

received information from Mrs. Gallegos and Plaintiff that substantiated such criminal conduct.  Additionally, Defendant knew or should have known that domestic abuse suspects often attempt to deflect police attention from their misconduct by accusing their partner or a friend or relative of their party of improper conduct.  Thus, Defendant Martinez knew or should have known that Mr. Gallegos was not, under the totality of the circumstances, a reasonably trustworthy crime victim whose unsupported claims could form the basis for probable cause.  Rather, Mr. Gallegos' statements provided reasonable suspicion to investigate Plaintiff's conduct but required further investigation to determine whether probable cause to arrest was present.

33.  Based upon the uncorroborated statements made to him by Mr. Gallegos, Defendant Martinez filed a criminal complaint against Plaintiff on the evening of October 10, 2012, charging Plaintiff with Aggravated Assault.  Defendant Martinez failed to interview Mrs. Gallegos before filing the charge.   In the Probable Cause Statement filed to get the magistrate to find probable cause, Defendant knowingly and deliberately omitted all the information he had in his possession about the allegations of domestic abuse made against Mr. Gallegos prior to the time Mr. Gallegos contacted the police.  Defendant knowingly and deliberately omitted the fact that he had investigated an allegation of domestic violence made against Mr. Gallegos earlier that evening by his wife, which included an allegation that Mr. Gallegos had assaulted and battered her.  Defendant knowingly and deliberately omitted the information he had received from Mrs. Gallegos and Plaintiff at the scene demonstrating that Mr. Gallegos had been distraught and behaved in an unstable manner that evening.   Defendant knowingly and deliberately omitted the fact that Mrs. Gallegos was an eyewitness to the alleged aggravated assault

and that he had not interviewed her.  These were material omissions of fact that deprived the magistrate of the knowing the totality of the circumstances and deprived the magistrate of the facts that would have shown that Mr. Gallegos was not a reasonably trustworthy party in this matter and that he had a motive to fabricate and exaggerate.

34.    Defendant knowingly and deliberately omitted the fact that he had before he left Mrs. Gallegos' residence, Mrs. Gallegos had stated that Mr. Gallegos had just driven by her house and that Plaintiff had told him he was going to drive by Mr. Gallegos' residence to make sure his truck was parked there because he was concerned about his daughter's safety and would stay the night at her house if Mr. Gallegos was still out and about.  This omission was material because without this information, Defendant's statement that he had seen Plaintiff driving by Mr. Gallegos' house and that Plaintiff had told him he had gone there to make sure Mr. Gallegos was home gave rise to a false and misleading inference that Plaintiff drove by for an improper reason- which Defendant knew was not the case.

35.    Based on the Probable Cause Statement submitted by Defendant, on October 11, 2012, a Santa Fe County Magistrate found probable cause and a preliminary hearing was set for December 12, 2012.  Plaintiff remained in jail until the evening of October 11, 2012, when he was released on bond.  During the time he was in jail, Plaintiff, as a former law enforcement officer, was in tremendous fear that another inmate would find this fact out and harm him.  Almost immediately after the charge was filed articles appeared on television, in the newspaper, and on the Internet setting forth the allegations Defendant Martinez put into his Probable Cause Statement.

36. After his release Plaintiff hired an attorney to defend against the bogus felony charge. Plaintiff's attorney submitted his discovery requests and his request to interview witnesses. On December 12, 2012, the day of the preliminary hearing, the Office of the District Attorney dismissed the charge without prejudice. On or about May 9, 2013, the Office of the District Attorney informed Plaintiff's attorney that the criminal charge would not be pursued. At this point, Plaintiff was able to have his revolver returned to him from the Santa Fe County Sheriff's Department. Defendant Martinez filed the charge in the absence of probable cause and maliciously. The criminal proceeding terminated in Plaintiff's favor and caused him to suffer damage.

37. At all times material hereto Defendant Martinez acted in an objectively unreasonable manner in regards to his decision to arrest Plaintiff and in regards to his decision to charge him with a felony. Defendant did not have probable cause to arrest Plaintiff. The seizure of Plaintiff was objectively unreasonable and violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure, as well as his state law right to be free from false arrest and false imprisonment. Additionally, Defendant caused Plaintiff to be subjected to the unlawful search of his person as a direct result of Plaintiff's unlawful arrest by Defendant, a further violation of Plaintiff's Fourth Amendment rights. At all times material hereto, Defendant's conduct was objectively unreasonable and, in fact, evidenced deliberate indifference to the Plaintiff's rights.

38. The omission of material information from the Affidavit of Probable Cause by Defendant Martinez in order to procure a court order supporting the arrest and filing of a criminal complaint against Plaintiff was a further violation of Plaintiff's Fourth Amendment rights and his Fourteenth Amendment right to due process as well as his

state law rights to be free from false imprisonment and malicious prosecution/malicious abuse of process. At all times material hereto, Defendant Martinez's conduct was objectively unreasonable and, in fact, evidenced deliberate indifference to the rights of Plaintiff.

39. Defendant Board of County Commissioners of Santa Fe County failed to provide adequate training to its deputy sheriffs regarding its written polices on the domestic abuse/ domestic violence investigations and/or failed to ensure that the training it gave was properly understood by those officers on that policy.  Defendant further failed to adequately train its officers regarding the law on reasonable suspicion to investigate before making an arrest and probable cause to arrest and/or to adequately ensure that the training provided was adequately understood by its deputies.  These failures were a direct cause of the injuries complained of by Plaintiff herein.

40.  As a direct and proximate result of the acts and omissions of the Defendants described in this Complaint, Plaintiff suffered significant emotional distress, significant aggravation of pre-existing stomach problems stemming from the emotional distress, humiliation, embarrassment, fear and anxiety, which continues to this date, damage to his reputation, and the violation of his federal constitutional rights.

41. Because of the intentional, willful, malicious and/or reckless indifference of Defendant's conduct, Plaintiff is entitled to punitive damages against Defendant Martinez.

WHEREFORE, Plaintiffs prays for judgment against Defendants and each of them as follows:

1.  For compensatory damages in an amount to be determined by the trier of fact,

jointly and severally.

2. For punitive damages against Defendant Martinez in an amount to be determined by the trier of fact.

3. For pre-judgment and post-judgment interest.

4. For attorney's fees and costs pursuant to 42 U.S.C. §1988.

5. For such other and further relief as the Court deems just and proper.

Respectfully Submitted,

_____
Richard Rosenstock
1121 Paseo de Peralta
Santa Fe, NM 87501
(505) 988-5324  Fax:  (505) 989-4844

DY???

Attorneys for Plaintiff