# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

GEORGE ULIBARRI,

        Plaintiff,

v.                                     No. CV 14-00196 WJ/LAM

MIKE MARTINEZ, in his individual capacity, et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon the Motion for Summary Judgment, **(Doc. 44)**, filed April 1, 2015, by Defendants Mike Martinez and Santa Fe County Board of County Commissioners. Having reviewed the parties' briefs and applicable law, the Court finds that Defendants' motion is well taken. Therefore, the motion is **GRANTED**; Plaintiff's federal claims against Defendant Martinez are dismissed with prejudice and Plaintiff's remaining claims are dismissed without prejudice.

### FACTUAL BACKGROUND

The following facts are undisputed except where noted and are viewed in the light most favorable to the nonmoving party. On the evening of October 10, 2012, Plaintiff George Ulibarri, a resident of Santa Fe, New Mexico, spoke by telephone with his adult daughter, who told him that her estranged husband, Robert Gallegos, was at her house and was being abusive and threatening. Plaintiff, a retired state police officer, called 911 at approximately 7:35 p.m. and

requested that the state police respond. However, after the state police called Plaintiff's daughter, she told them that Gallegos was leaving and canceled the dispatch.

Meanwhile, Plaintiff drove from his home to his daughter's house in La Cieneguilla, New Mexico. Before Plaintiff could exit his truck, words were exchanged between him, his daughter, and Gallegos. During that time, Plaintiff claims that Gallegos had observed a holstered gun in his truck. Plaintiff says that Gallegos then approached his own vehicle and began rummaging through it, saying to Plaintiff, "You know I have guns, too." Plaintiff had exited his truck with his holstered gun in hand by this time, though he claims he never removed the gun from the holster, cocked it, or pointed it. However, he admits that he yelled to Gallegos, "Do something. Get that gun, and I'll blow your head off." Gallegos drove away shortly thereafter.

During this encounter, Plaintiff's daughter had herself called 911 at approximately 8:04 p.m., describing her earlier 911 call and stating that Gallegos still had not left her home. She asked the dispatcher to send law enforcement at that time, and the dispatch records indicate that a state police unit was consulted. However, the same records show that at 8:09 p.m., Plaintiff canceled this second 911 call, saying that her husband had already left. *See* (**Doc. 53 Ex. 5**), CAD Call Information, at 2.

Defendant Martinez,[1] a deputy and supervisor with the Santa Fe County Sheriff's Department, did not hear the dispatch for either of Plaintiff's 911 calls. However, after reading a dispatch report on his computer system concerning the second call and seeing that Plaintiff's daughter had canceled it, Defendant decided to respond to the daughter's home to conduct a welfare check. Defendant arrived at 8:16 p.m.

---

[1] Because Plaintiff requests dismissal of his claims against the Santa Fe County Board of Commissioners, *see infra*, the term "Defendant" is hereafter used to refer to Defendant Martinez unless otherwise noted.

There is some dispute as to what Plaintiff and his daughter told Defendant after he arrived. Plaintiff claims that he and his daughter told Defendant that she and Gallegos were going through divorce proceedings and that Gallegos had stopped by the house to pick up personal items. According to Plaintiff, they told Defendant that Gallegos had been verbally and physically abusive during his visit, had refused to leave when asked, and had initially blocked Plaintiff from exiting his truck. Plaintiff says he told Defendant that his gun had been on the front seat of his truck, that he had pushed the gun across the seat to keep it out of Gallegos's reach, and that he believed Gallegos to be carrying a gun in his own vehicle. Plaintiff does not say whether he told Defendant at that time that Gallegos had suggested he was retrieving a gun from his vehicle or that Plaintiff himself stepped out of his truck at that time with his gun in hand. Further, in his unsworn response brief, Plaintiff expressly denies having told Defendant that he threatened to "blow [Gallegos's] head off." For his part, Defendant denies that Plaintiff or his daughter shared any of this information with him.

As Defendant was preparing to leave, Plaintiff's daughter claimed to have seen Gallegos's vehicle drive past her house. Plaintiff says that he told Defendant at that time that he intended to drive past Gallegos's house in Santa Fe to see if Gallegos's vehicle was parked there, then return to his daughter's home and stay the night if the vehicle were not there. Defendant denies that Plaintiff made this statement to him. Dispatch records show that Defendant ended the visit and left Plaintiff's daughter's house no later than 8:32 p.m.

Sixteen minutes later, Gallegos called 911 and reported that he had been threatened with a gun. At 9:01 p.m., Defendant was dispatched to Gallegos's father's home, where Gallegos was staying.[2] On his way there, Defendant called Gallegos, who told him that Plaintiff had pulled a gun on him and threatened him. Defendant arrived at the house around 9:23 p.m. and spoke to

---

[2] For simplicity, the Court will hereafter refer to this residence as "Gallegos's home" or the like.

Gallegos in the driveway. Gallegos elaborated that while he was at his estranged wife's home, he heard the sound of a gun cocking and turned to see Plaintiff with his hand on a black revolver, which was in his waistband. Gallegos told Defendant that Plaintiff then said, "Give me a reason to put a bullet between your eyes." Gallegos said he left his wife's home after Plaintiff made this threat.

As Gallegos and Defendant were speaking, Plaintiff drove by Gallegos's home in his truck. Gallegos recognized the truck and told Defendant that Plaintiff was driving by at that moment. Defendant then drove after Plaintiff in his police unit and pulled Plaintiff over in a parking lot.

Defendant approached Plaintiff's truck and asked Plaintiff why he was driving past. Plaintiff testified that he told Defendant, "Don't you remember that I told you that I was going to drive by Robert's house to make sure that he was home, or if not, I was going to go to spend the night with my daughter?" Defendant says this exchange did not happen. Eventually Defendant asked Plaintiff if he had a firearm in the truck, and Plaintiff revealed that his holstered gun was under his front seat on the floorboard.

Although the parties dispute the order of events, both sides agree that Defendant ordered Plaintiff out of his truck, took him into custody, handcuffed him, and recorded his statement. In his statement, Plaintiff admitted to speaking to Gallegos with his gun in hand but denied cocking his gun, putting it in his waistband, or threatening Gallegos. Eventually another deputy transported Plaintiff to the sheriff's office.

After taking a written statement from Gallegos, Defendant filed a Statement of Probable Cause and a criminal complaint charging Plaintiff with aggravated assault. The complaint was signed by a magistrate. Plaintiff was released on his own recognizance the next day, and the

district attorney's office dismissed the complaint without prejudice one month later. In May 2013, citing "insufficient evidence" and "conflicting statements of Robert Gallegos, Pat Gallegos, and [Plaintiff]," the district attorney's office declined to pursue the case further.

PROCEDURAL BACKGROUND

Plaintiff filed his initial complaint in March 2014 and an amended complaint the following month. In the operative amended complaint, Plaintiff alleges that Defendant subjected him to an unreasonable seizure, in violation of his Fourth Amendment rights, "by failing to conduct a constitutionally adequate investigation and arresting him without probable cause." Plaintiff further claims that Defendant subjected him to false arrest and malicious prosecution in violation of his Fourth and Fourteenth Amendment rights through "deliberate omission of material facts from [his] Probable Cause Statement." Plaintiff's federal claims are brought pursuant to 42 U.S.C. § 1983,[3] with jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff also alleges analogous state-law claims against Defendant for these purported violations pursuant to the New Mexico Tort Claims Act, N.M.S.A. 1978, § 41-4-1 *et seq.*, with supplemental jurisdiction asserted pursuant to 28 U.S.C. § 1367. Finally, Plaintiff accuses the Board of Commissioners of the County of Santa Fe, through the Santa Fe County Sheriff's Department, of inadequate training. Defendants filed the instant motion on February 20, 2015, seeking summary judgment on the basis of qualified immunity as to all federal claims.

## LEGAL STANDARDS

### I.  Summary Judgment

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled

---

[3] "[Section] 1983 creates a cause of action against individuals who violate federal law while acting 'under color of state law.'" *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1353 (10th Cir. 1996) (quotation omitted).

to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit, and the dispute is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). In ruling on a motion for summary judgment, the Court may neither make credibility determinations nor weigh the evidence. *See Gossett v. Oklahoma*, 245 F.3d 1172, 1175 (10th Cir. 2011) (quotation omitted).

Under normal circumstances, the party seeking summary judgment bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *See, e.g.*, *Celotex*, 477 U.S. at 323; *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, the nonmoving party must designate specific facts showing that there is a genuine issue for trial. *See, e.g.*, *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256. The existence of some alleged, immaterial factual dispute between the parties or a mere "scintilla of evidence" supporting the nonmoving party's position will not defeat an otherwise properly supported motion for summary judgment. *See Anderson*, 477 U.S. at 252, 256.

## II.    Qualified Immunity

Additional steps are taken when a summary judgment motion raises a defense of qualified immunity. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* The court may consider either of these prongs before the other "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236

(2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Rojas v. Anderson*, 772 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted).

The "clearly established" inquiry exists in part to protect officers with "arguable probable cause," which exists where "a reasonable police officer in the same circumstances . . . and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014). Because qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law," summary judgment on the basis of qualified immunity is appropriate "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Thus, the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. A right is only considered to be clearly established when there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quotation omitted).

At the summary judgment stage, a court generally must "view the facts and draw reasonable inference 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *id.* unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," *id.* at

380. "However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record . . . ." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citation omitted). "In short, although [courts] will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal citations omitted).

DISCUSSION

I.      **Preliminary Matters**

    A.  <u>Claims Against the County</u>

In a footnote at the beginning of his response brief, Plaintiff requests dismissal of his § 1983 claim against the Santa Fe County Board of Commissioners. Defendants are not opposed to this relief. The Court will therefore dismiss this claim without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). Because this is the only claim brought against this Defendant, the Court will also dismiss the Santa Fe County Board of Commissioners as a Defendant in this action.

    B.  <u>Plaintiff's Exhibits</u>

Before turning to the merits of Defendants' motion, the Court considers whether certain exhibits submitted by Plaintiff should be excluded or stricken. Local Rule 10.5 limits "[a]ll exhibits to a motion, response or reply" to "a total of fifty (50) pages, unless all parties agree otherwise." D.N.M.LR-Civ. 10.5. Plaintiff submitted seventy-four (74) pages of exhibits in support of his response brief, putting him twenty-four pages over the limit. Although Plaintiff sought and obtained permission from defense counsel and the Court to file a response brief in

excess of the page limit set forth in Local Rule 7.5, *see* **(Doc. 52)**, Order, there is no indication that Plaintiff sought either concurrence of opposing counsel or permission from the Court to exceed the page limit for exhibits as required by Local Rule 10.5.

To bring Plaintiff's submissions within the page limit for exhibits set forth in the Local Rules, the Court will strike two documents. First, Plaintiff attached a twenty-two page "expert report" from Roger Clark, a "police procedures consultant." *See* **(Doc. 53 Ex. 8)**, Report (hereinafter "Clark Report"). "Courts generally allow experts in [criminal justice, police training, and use of deadly force] to state an opinion on whether the conduct at issue fell below accepted standards in the field of law enforcement." *Zuchel v. City and Cnty. of Denver, Colo.*, 997 F.2d 730, 742 (10th Cir. 1993). However, the bulk of the Clark Report's findings do not touch on this subject but instead address legal questions that are more properly left to the Court, such as whether certain facts provided probable cause for Plaintiff's arrest and whether Defendant's omissions from his Statement of Probable Cause deprived the magistrate of facts necessary to a probable cause determination. *See id.* (noting that experts on police tactics cannot testify as to whether an officer's conduct was unconstitutional, as legal conclusions must be reached by the reviewing court). Still other findings are not properly before the Court since they either are duplicative of the factual record before the Court, are irrelevant to any claims other than the one voluntarily dismissed by Plaintiff, or imply that the Court should credit certain witness's testimony over others, which it may not do at the summary-judgment stage. Since the contents of the Clark Report should be excluded on these grounds, the striking of that document should have no impact on the Court's resolution of the instant motion.

Second, the Court will strike the two-page deposition excerpt of Eric Shrum. *See* **(Doc. 53 Ex. 9)**, Deposition. Shrum is a state police officer who arrived at Plaintiff's daughter's home

following the second 911 call. However, Plaintiff considers Shrum's involvement in this action to be incidental, a conclusion not disputed by Defendant. Thus, Shrum's deposition sheds no light on the legal questions before the Court and so it will be stricken. As with the Clark Report, the striking of this document should not affect the Court's analysis of the issues before it.

With the striking of the twenty-two-page Clark Report and the two-page Shrum deposition excerpt, Plaintiff's exhibits now fall exactly within the fifty-page limit permitted by the Court's Local Rules.[4] The Court now turns to the merits of Defendant's motion.

## II. Motion for Summary Judgment

Plaintiff brings two claims alleging constitutional violations pursuant to § 1983. First, Plaintiff alleges that his arrest was objectively unreasonable and violated his Fourth Amendment right to be free from unreasonable seizures. Second, Plaintiff asserts that the omission of certain facts from the Statement of Probable Cause accompanying his criminal complaint constituted malicious prosecution in violation of the Fourth and Fourteenth Amendments. Defendant asserts a defense of qualified immunity as to both claims.

### A. Plaintiff's Arrest

The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials. U.S. CONST. amend. IV; *see, e.g.*, *United States v. Burleson*, 657 F.3d 1040, 1044-45 (10th Cir. 2011). To that end, a warrantless arrest must be supported by probable cause. *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). Such probable cause only exists where the "facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v.*

---

[4] Further, even if the Court were to consider the substance of the Clark Report and the Shrum deposition, the Court's conclusions as to the disposition of Plaintiff's claims would not change.

*Edwards*, 242 F.3d 928, 934 (10th Cir. 2001) (quotation omitted). This is an objective standard, turning on whether a reasonable officer would have believed that probable cause existed based on the information he possessed at the time of the arrest; an officer's subjective belief as to whether there was probable cause is not dispositive. *Valenzuela*, 365 F.3d at 896 (citing, *e.g.*, *Florida v. Royer*, 460 U.S. 491, 507 (1983)).

"Probable cause does not require facts sufficient for a finding of guilt," *United States v. Morris*, 247 F.3d 1080, 1088 (10th Cir. 2001); indeed, it does not even "require the suspect's guilt to be 'more likely true than false,'" *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (citation omitted). Still, probable cause "does require 'more than mere suspicion.'" *Morris*, 247 F.3d at 1088. In determining whether an officer possessed probable cause to support an arrest, "the relevant question is whether a 'substantial probability' existed that the suspect committed the crime . . . ." *Kerns*, 663 F.3d at 1188.

In determining whether an arrest was proper, courts must "look not only to the facts supporting probable cause, but also to those that militate against it." *Valenzuela*, 365 F.3d at 897 (citation omitted). "[I]n cases where [officers] have both inculpatory and exculpatory evidence[,] they must not ignore the exculpatory evidence in order to find probable cause." *Felders*, 755 F.3d at 879 (quotation omitted). "Thus, in assessing the totality of the circumstances, a reviewing court 'must examine the facts individually in their context to determine whether rational inferences can be drawn from them' that support a probable cause determination." *Valenzuela*, 365 F.3d at 897 (quotation omitted).

When a defendant officer raises a defense of qualified immunity in the context of a warrantless arrest, he is "entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir.

1995) (quotation and internal punctuation marks omitted). That is, a police officer "who reasonably but mistakenly conclude[s] that probable cause is present [is] entitled to immunity." *Id.*

Here, Defendant insists that probable cause existed so as to support his arrest of Plaintiff. He notes that Gallegos called the police himself and that he never told Gallegos that he might be under investigation for a crime. Gallegos told Defendant about an encounter at Plaintiff's daughter's home that was consistent, at least in broad strokes, with Defendant's knowledge that a skirmish of some sort had occurred there. After hearing Gallegos's allegations that Plaintiff had threatened him with a gun, Defendant became aware that Plaintiff was driving by Gallegos's house, which was not located near Plaintiff's own home. After pulling Plaintiff over, Defendant observed that Plaintiff was carrying a gun under his seat. Defendant claims that these facts, taken in their entirety, led him to appropriately conclude that probable cause existed to suspect Plaintiff of having committed a crime.

Under the qualified-immunity analysis, Plaintiff shoulders the burden to show that his arrest was in violation of the Fourth Amendment. *See Pearson*, 555 U.S. at 236. Reviewing the facts in the light most favorable to Plaintiff, the Court concludes that, given the facts known to Defendant at the time of the arrest, a substantial probability existed that Plaintiff had committed the alleged crime such that Plaintiff's arrest was supported by probable cause. Plaintiff's arguments to the contrary do not pass muster.

i.     *Presumption of Trustworthiness*

First, although acknowledging that "victim-eyewitness" statements to police are generally presumed to be trustworthy, *see United States v. Jackson*, 818 F.2d 345, 348 (5th Cir. 1987), Plaintiff claims that Defendant should have realized that Gallegos was not entitled to that

presumption since he was a potential criminal suspect with motivation to lie to Defendant. However, the cases cited by Plaintiff in support of his position, all from outside the Tenth Circuit, are factually distinguishable. In two of the cases, the complainant had either admitted to criminal involvement, *see id.*, or was already being prosecuted for suspected criminal involvement and had certain charges dropped after alleging wrongdoing by another, *Hale v. Fish*, 899 F.2d 390 (5th Cir. 1990). By contrast, at the time of Defendant's interview, Gallegos had neither admitted to criminal acts nor been prosecuted for any, and there is no indication that he expected to receive favorable treatment or less prosecutorial scrutiny upon lodging his allegations against Plaintiff.

Plaintiff also cites an Eighth Circuit case involving the arrest of a man for child abuse based solely on allegations by his estranged wife, despite multiple medical examinations showing no medical evidence of abuse and a prosecutor's instructions that the officer simply continue with his investigation. *See Ripson v. Alles*, 21 F.3d 805 (8th Cir. 1994). Although the facts in that case are largely inapposite here, they do highlight that Plaintiff's argument—that an officer should factor a potential complainant's motivation to lie—cuts both ways. Plaintiff notes that his daughter and Gallegos, like the couple in *Ripson*, were going through an acrimonious separation. Though the Court makes no credibility determinations at this time and construes the facts in the light most favorable to Plaintiff, an officer in Defendant's shoes could reasonably conclude that under those circumstances, Plaintiff and Gallegos each had sufficient motivation to accuse the other—accurately or not—of wrongdoing. Unlike the officer in *Ripson*, however, Defendant relied on more than just the complainant's accusations; he also relied on his knowledge of a dispute at Plaintiff's daughter's home and the fact that Plaintiff drove past Gallegos's residence shortly thereafter while armed. Moreover, unlike *Ripson*, Defendant

possessed no objective evidence contradicting Gallegos's accusations at the time of Plaintiff's arrest. In short, the fact that Gallegos and Plaintiff had been in a dispute, without more, did not defeat the presumption that Gallegos's statements as a victim-eyewitness were trustworthy. *Accord Rose v. City of Wenatchee*, No. CS-03-0460-LRS, 2005 WL 1898565, at \*7 (E.D. Wash. 2005) (unpublished) (noting that the trustworthiness of a witness can be presumed despite the presence of a personal dispute when the witness "would ultimately be placed before the trier of fact who would hear all of the evidence and render a verdict").

     ii.  *Plaintiff's Armed Presence Near Defendant's Home*

Relatedly, Plaintiff argues that his decision to drive past Gallegos's residence should not have factored into Defendant's probable-cause analysis since he had previously told Defendant of his intention to do so for other reasons. He also disputes Defendant's decision to take into account the fact that he was armed at the time, pointing out that he had previously told Defendant that he carries a gun and insisting that retired law enforcement officers such as himself are often regularly armed. Despite the innocent explanations given for each of these individual facts, "[a] factor does not become irrelevant [to the probable-cause analysis] simply because it is 'readily susceptible to an innocent explanation.'" *Valenzuela*, 365 F.3d at 897 (quotation omitted); *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002) (rejecting the "divide-and-conquer" approach to an officer's observations when a series of acts "perhaps innocent in [themselves]," may "warrant[] further investigation" when considered in their totality). Even given the possibility that each element of Plaintiff's actions, taken individually, might not seem nefarious, a reasonable officer considering the totality of the circumstances would understandably be concerned that a man alleged to have threatened someone with a firearm would drive some distance to the purported victim's home while armed.

### iii.    Gun in Waistband

Plaintiff next contends that Gallegos's description of him having a cocked gun in his waistband was so implausible as to render his story suspect, as doing so would be an unsafe maneuver that no one familiar with firearms would ever do. Given that the Court regularly encounters criminal defendants who are accused, and sometimes convicted, of engaging in unwise and unsafe illicit activity despite "knowing better," the Court concludes that the potential dangerousness of an act does not necessarily reduce the probability that the act occurred. Even assuming that Defendant would reach the same conclusion as Plaintiff regarding the relative safety of what Gallegos accused him of doing, the facts before Defendant at the time "lead[] sensibly to their conclusions of probability." *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

### iv.    Insufficient Investigation

Plaintiff also asserts that Defendant could not have had probable cause to arrest him because Defendant did not conduct a sufficient investigation before arresting him. Specifically, Plaintiff asserts that Defendant should have interviewed his daughter regarding Gallegos's allegations, either by calling on the telephone or visiting her, because he knew her to be an eyewitness who was readily available at the scene of the alleged crime. Such investigation, Plaintiff insists, was a necessary prerequisite to an arrest.

> Tenth Circuit caselaw does not support
>
> [the] broad proposition that a police officer who interviews witnesses and concludes probable cause exists to arrest violates the Fourth Amendment by failing to investigate the defendant's alleged alibi witnesses. Instead, the cases state that the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all . . . .

*Romero*, 45 F.3d at 1476-77 (citations omitted). Accordingly, "in the absence of a showing that [the defendant's] initial probable cause determination was itself unreasonable," an officer's probable-cause assessment "based on the facts and information known to him" is not negated by his failure to interview a suspect's alibi witnesses. *See id.* at 1477-78.

This rule defeats Plaintiff's argument. First, Plaintiff acknowledges that Defendant did in fact speak to him and his daughter "at the scene" prior to Gallegos's 911 call and was familiar with their narrative of the events in question. Second, probable cause at the time of Plaintiff's arrest was supported by Gallegos's statement, Defendant's own knowledge of the dispute at Plaintiff's daughter's home, and Plaintiff's presence near Gallegos's home while armed. Thus, Defendant's failure to interview Plaintiff's daughter again after encountering Plaintiff did not undermine the probable-cause determination made on these facts. Finally, it is unclear that Plaintiff's daughter would be appropriately classified as an "alibi witness" like those at issue in *Romero*. Although his discussion of the facts differs in some respects from Gallegos's allegations, Plaintiff concedes that he threatened to "blow [Gallegos's] head off" while holding a holstered weapon in hand. Plaintiff's daughter either witnessed this exchange or did not, and in the latter case she would not be able to affirmatively state that the exchange had not occurred. Accordingly, had Defendant interviewed Plaintiff's daughter (and presuming she would have honestly related her recollection of events), her statements would have either bolstered or had no effect on Defendant's probable-cause determination. The Court concludes from these facts that Defendant's probable-cause determination was not weakened by his failure to speak with Plaintiff's daughter a second time before arresting him.

v.      *Arguable Probable Cause*

Although the Court concludes that Defendant possessed probable cause to support Plaintiff's arrest, the Court also holds that a reasonable police officer possessing Defendant's knowledge in the same circumstances "*could* have reasonably believed that probable cause existed in light of well-established law." *Felders*, 755 F.3d at 879 (citations omitted). Caselaw in the Tenth Circuit and elsewhere has established the presumptive reliability of complainant statements to police, and Plaintiff cites no binding decisions on point that suggests that a deviation from this principle should have applied to Gallegos. Nor does Plaintiff cite any relevant binding cases on point that invalidate Defendant's decisions to rely on the substance of Gallegos's statements, to factor in Plaintiff's armed presence near Gallegos's home, or to disregard Plaintiff's explanation of his actions. Finally, *Romero* makes clear that Defendant did not fail to investigate properly, and Plaintiff's citations to the contrary do not line up sufficiently with the facts of this case.[5] Accordingly, the Court concludes that Defendant possessed at least "arguable probable cause" supporting his arrest of Plaintiff.

With respect to his arrest, Plaintiff has failed to show a violation of his clearly established constitutional rights. Accordingly, Defendant is entitled to qualified immunity as to Plaintiff's federal claims regarding that arrest.

B.  <u>False Imprisonment and Malicious Prosecution</u>

Plaintiff also alleges that Defendant subjected him to "false imprisonment and malicious prosecution" in violation of the Fourth and Fourteenth Amendments by omitting purportedly

---

[5] Although Plaintiff cites *Lusby v. T.G. & Y Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984), the officer in that case relied only on a store manager's accusations of shoplifting, without any corroborating details, and refused to speak to a cashier on the scene before arresting the plaintiff. Similarly, Plaintiff relies on *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007), where the officer acted on double-hearsay that ultimately originated from "a barely-verbal two-year old child," without taking any other necessary investigative action. By contrast, Defendant's probable-cause determination rested not only on Gallegos's accusations, but also on Defendant's own investigative observations and the reasonable inferences he drew from them.

material information from the Statement of Probable Cause. The Court begins by observing that a single § 1983 claim for *both* false imprisonment and malicious prosecution should not stand, as these claims address two distinct ills. "Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims. Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims. Like rain and snow, the claims emanate from the same source, but under different conditions." *Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013) (internal citations omitted). Thus, as an initial matter, the Court must determine whether Plaintiff's seizure was imposed with or without legal process.

Where a detention arises due to a warrantless arrest, the appropriate claim is one for false imprisonment, since the detention occurs without legal process. *See Wallace v. Kato*, 549 U.S. 384, 389 (2007). However,

> a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges. Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied . . . by *wrongful institution* of legal process.

*Id.* at 390 (internal citations omitted). Here, this particular § 1983 claim is premised only upon Plaintiff's detention following Defendant's alleged "omission of material information from the [Statement] of Probable Cause" accompanying the criminal complaint. Because the filing of these documents constituted the institution of legal process, the Court finds that Plaintiff's claim is properly characterized as one for malicious prosecution.

Next, the Court notes that Plaintiff's § 1983 malicious prosecution claim must rest solely on the Fourth Amendment. The Fourteenth Amendment's substantive due process protections do not provide a basis for a malicious prosecution claim, *see Albright v. Oliver*, 510 U.S. 266, 272-75 (1994), and a procedural due process claim would only stand in the absence of adequate post-deprivation state tort remedies, *see Myers*, 738 F.3d at 1193-94; *Becker v. Kroll*, 494 F.3d 904,

921 (10th Cir. 2007) (citations omitted). Under New Mexico law, the tort of malicious prosecution may be pursued as a claim of malicious abuse of process, *see Durham v. Guest,* 145 N.M. 694, 698 (2009) (citations omitted), and indeed Plaintiff raises exactly this state-law claim in his amended complaint. This alone suffices to eliminate his Fourteenth Amendment claim. *Cf. Myers*, 738 F.3d at 1193-94.[6]

This leaves Plaintiff's § 1983 malicious prosecution claim under the Fourth Amendment. Such a claim "includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). The parties primarily dispute the third element, concerning probable cause regarding Plaintiff's confinement and prosecution following the filing of the criminal complaint and Statement of Probable Cause.[7]

Plaintiff contends that caselaw concerning arrest warrant affidavits should inform the Court's probable-cause analysis concerning the Statement of Probable Cause, and Defendants do not dispute this approach. In the context of an arrest warrant, "it is a Fourth Amendment violation to 'knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause.'" *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (quotation omitted). "Where information has been omitted from an affidavit, [courts] determine

---

[6] Of course, "[i]n a technical sense, a Fourth Amendment claim against New Mexico officers is also a Fourteenth Amendment claim, because that is the amendment that incorporates the Fourth Amendment's protections against the states. [The Court] avoid[s] this terminology here to reduce confusion." *Mondragon v. Thompson*, 519 F.3d 1078, 1082 n.3 (10th Cir. 2008) (internal citation omitted).

[7] Defendants also argue in their reply brief that "there is no evidence whatsoever of malice." However, the Court will not consider a statement raised in passing in a reply brief without any further elaboration. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) (holding that arguments raised for the first time in a reply brief are generally deemed waived); *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The [C]ourt will not consider . . . 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.'").

the existence of probable cause 'by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause . . . .'" *Id.* (quotation omitted); *see also Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991) ("Recklessness may be inferred from omission of facts which are 'clearly critical' to a finding of probable cause." (quotation omitted)).

Plaintiff does not dispute that the facts presented in the Statement of Probable Cause, in and of themselves, warrant a finding of probable cause. Instead, Plaintiff lists six "material facts" that he believes would have vitiated probable cause if included in the criminal complaint. These can be summarized as follows:

1. Plaintiff's daughter had previously told Defendant that Gallegos had battered her.

2. Defendant did not ask Gallegos about the allegations against him.

3. Plaintiff had told Defendant that he was going to drive by Gallegos's residence to ensure that Gallegos was staying there.

4. Plaintiff had previously told Defendant that he was carrying a gun.

5. Plaintiff was a retired state police officer, and therefore was "highly unlikely" to have placed a cocked gun in his waistband.

6. Defendant did not further question Plaintiff's daughter, who was an eyewitness to Plaintiff's alleged threatening of Gallegos.

*See* (**Doc. 53**), Response, at 27-28.

The Court holds that the second fact—that Defendant did not ask Gallegos about Plaintiff's daughter's allegations against him—has no bearing on whether Defendant had probable cause to believe that Plaintiff had committed a crime. Even accepting Plaintiff's assertion that the allegations against Gallegos were relevant to whether Gallegos was a credible complainant, this does not explain why Defendant's failure to question Gallegos, and his

subsequent decision not to record this failure in the Statement of Probable Cause, would itself affect the probable-cause analysis concerning the allegations against Plaintiff.

As to the rest of Plaintiff's list of facts omitted from the Statement of Probable Cause, the Court has already concluded that those facts themselves did not substantively negate Defendant's probable-cause determination upon arresting Plaintiff. As such, the Court finds that the narrative in the Statement of Probable Cause would have still given rise to a finding of probable cause, even if the omitted facts cited by Plaintiff had been included. *See Taylor v. Meacham*, 82 F.3d at 1562. Because an absence of probable cause is a critical element of a § 1983 claim for malicious prosecution under the Fourth Amendment, Plaintiff has failed to show that his clearly established constitutional rights were violated by the omissions in question. Defendant is thus entitled to qualified immunity, and therefore summary judgment, as to this claim.

## III.    State Law Claims

Although Defendants do not address them in the instant motion, Plaintiff has also brought state-law claims of false arrest, battery, false imprisonment, and malicious abuse of process. Plaintiff asserts the Court's supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a). However, because the only remaining Defendant has been awarded summary judgment on all federal claims against him, the Court may in its discretion decline to exercise supplemental jurisdiction over the remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3).

"[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any

remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998); *see also Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (applying this rule where summary judgment is granted as to all federal claims).

Here, only two factors give the Court pause. First, the Court acknowledges that a significant amount of energy has been already expended by all parties in this forum. On the other hand, this fact should allow any subsequent litigation in state court to proceed smoothly and expeditiously. Moreover, the parties have not litigated any dispositive motions concerning these state-law claims, as Defendants' Motion for Summary Judgment only attacks Plaintiff's federal claims on qualified-immunity grounds. As such, there should be only minimal duplication of effort if these claims were dismissed and refiled in state court.

Second, the fact that the events underlying this action occurred in October 2012 raises statute-of-limitations concerns. The Court observes that Plaintiff's state-law claims would fall under the New Mexico Tort Claims Act, which only features a two-year limitations period. *See* N.M.S.A. 1978, § 41-4-15. Although New Mexico has a "saving statute" that applies to most claims, *see id.* § 37-1-14, that statute does not apply to the limitations period set forth in the Tort Claims Act, *see Estate of Gutierrez v. Albuquerque Police Dep't*, 104 N.M. 111, 114 (Ct. App. 1986), *overruled on other grounds, Bracken v. Yates Petroleum Corp.*, 107 N.M. 463 (1988). However, as an equitable matter, New Mexico courts recognize that "a federal court's discretionary refusal to entertain pendent jurisdiction tolls the statute of limitations applicable to [such] claim[s]." *Gathman-Matotan Architects & Planners, Inc. v. State Dep't of Fin. & Admin.*, 109 N.M. 492, 494 (1990) (citing *Bracken*, 107 N.M. at 465-66). If the Court declines to exercise jurisdiction over Plaintiff's state-law claims and accordingly dismisses them without prejudice, the Court has every reason to believe that a state court will toll the statute of limitations

appropriately. *See Rivera v. Bates*, No. CIV 12-0473 JB/RHS, 2014 WL 3421050, at \*55 (D.N.M. June 21, 2014) (unpublished).

With these concerns allayed, the *Carnegie-Mellon* factors of "judicial economy, convenience, fairness, and comity" weigh in favor of the Court declining to exercise supplemental jurisdiction over Plaintiff's state-law claims. The Court will therefore take the course encouraged by the Tenth Circuit, *see Koch*, 660 F.3d at 1248 (quotation omitted), and decline jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the foregoing reasons,

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment, (**Doc. 44**), is GRANTED, and Plaintiff's claims against Defendant Martinez brought pursuant to 42 U.S.C. § 1983 are DISMISSED WITH PREJUDICE;

IT IS FURTHER ORDERED that Plaintiff's claim against Defendant Santa Fe County Board of Commissioners are DISMISSED WITHOUT PREJUDICE; and

IT IS FINALLY ORDERED that the Court declines to exercise supplemental jurisdiction over the remaining state-law claims, and that these claims are DISMISSED WITHOUT PREJUDICE.

**SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE